UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| IN RE           ) | |
| ) | Case No. 12-00902-TLM |
| LAWRENCE DARWIN MCKAY,  ) | |
| ) | Chapter 7 |
| Debtor.   ) | |
| _____ ) | |
| ) | |
| DARRELL ADAMS, in his capacity   ) | |
| as trustee for the CARMELLA   ) | |
| ADAMS TRUST,     ) | |
| ) | |
| Plaintiff,   ) | |
| ) | |
| v.           ) | Adv. No. 13-06009-TLM |
| ) | |
| LAWRENCE DARWIN MCKAY,   ) | |
| ) | |
| Defendant.   ) | |
| _____ ) | |

**MEMORANDUM OF DECISION**
_____

Plaintiff Darrell Adams ("Adams"), brought this adversary proceeding in his capacity as Trustee of the Carmella Adams Trust, seeking to deny the discharge of debtor Lawrence Darwin McKay ("Debtor") under § 727(a)(3).[1] The matter was tried on November 14, 2013, and was subsequently taken under

---

[1] Unless otherwise indicated, all chapter, section and other statutory references are to the Bankruptcy Code, Title 11, U.S.C. §§ 101–1532 (the "Code"), and all rule references are to the Federal Rules of Bankruptcy Procedure 1001–9037.

MEMORANDUM OF DECISION - 1

advisement.  This Decision constitutes the Court's findings and conclusions pursuant to Rule 7052.

**FACTS**

**A.    Debtor's business background**

Debtor is a self-employed business man.  According to Debtor's testimony, beginning in 1978, he owned multiple, successful sod farm businesses, including Turf Company, Turf Corporation, and Turf Company LLC.[2]  In 2000, he purchased a turf farm in Sparks, Nevada, now incorporated as the Turf Company of Nevada, Inc., and which now does business as High Desert Turf.  Among the other tasks he performed for these companies, Debtor kept or reviewed financial records, reviewed tax documents prepared by an accountant, and supervised up to twenty-five employees.  At least one of these companies operated as a holding company for the others.[3]  In 2011, Debtor became an owner of AmHaul Services LLC, a company that hauled water in the North Dakota oil fields.

---

[2] Debtor's schedules and statement of financial affairs do not list a business called Turf Company LLC, but do list Turflands LLC as a "holding company for turf & funds." Case No. 12-00902-TLM, Doc. 22 at 40.  The Court treats statements made by Debtors under penalty of perjury in their schedules and statements as admissions under Fed. R. Evid. 801(d).  *See, e.g., Murietta v. Fehrs (In re Fehrs)*, 391 B.R. 53, 62 n.16, 08.3 I.B.C.R. 116, 188 n.16 (Bankr. D. Idaho 2008).

[3] Neither the schedules nor testimony clarified the relationships between these businesses.  Ultimately, the exact details regarding Debtor's turf businesses are immaterial, and serve only as background from which the Court measures Debtor's level of business sophistication.

MEMORANDUM OF DECISION - 2

**B.    Nevada Granite Industries**

In 2004, Debtor's son, Brian McKay ("Brian"), was completing his master's degree in business administration and wanted to start his own business. Brian met a Granite Transformations franchisee who was very successful, and eventually decided he wanted to open a Granite Transformations franchise.[4] By the time Brian actively pursued the franchise, another party already had rights to the Boise, Idaho, region, so Brian decided to open a business in the Reno-Tahoe region.

When Debtor received a large inheritance, Brian approached him about investing that money as start-up capital so Brian could purchase a Granite Transformations franchise. Debtor agreed, and the two formed Nevada Granite Industries Inc. ("NGI") in January 2005. *See* Ex. 100 (NGI Articles of Incorporation, filed with the Nevada Secretary of State on January 20, 2005). Debtor received 75,250 shares of NGI stock for his initial investment; Brian received 53,750 shares.[5]

Testimony from both Debtor and Brian revealed that, while NGI was primarily Brian's business, Debtor had some involvement in it. He spent a significant amount of time in Reno during the winter of 2005, during a quiet time

---

[4] Granite Transformations fabricates and installs granite countertops for remodeling and new construction.

[5] Nothing in the record established the amount of start-up capital provided by Debtor.

MEMORANDUM OF DECISION - 3

for his turf businesses, providing help and advice while Brian was setting up the business. Debtor testified that after that winter he had little time to participate in the operations of NGI, but he attended meetings of the board of directors and of the shareholders, usually when he had to be in Nevada on trips related to his turf business. He casually reviewed NGI's financial records and continued to provide advice to Brian. But Debtor was not involved in NGI's day-to-day operations, nor did he have any book-keeping responsibilities for the business.

Debtor also provided cash infusions needed to keep the business running. *See* Ex. 114 (NGI's Quickbooks account ledger for "28002 Long Term Darwin McKay"). Brian testified that, after the initial start-up capital, the remaining transfers of funds from Debtor to NGI were loans. Debtor's exhibits included promissory notes for all transactions after July 14, 2006. Ex. 206. No promissory notes were produced for transfers prior to that time, although several were listed on the Quickbooks ledger.

**C.     Adams, the Trust and NGI**

By 2006, Brian had determined that NGI needed a significant cash infusion. He had a friend list an investment opportunity with NGI on the region's real estate multiple listing service, and was eventually approached by Adams.[6]

Adams ultimately paid $356,250.00 for 53,570 previously unissued shares

---

[6] At all times relevant to this proceeding, Adams was acting in his capacity as trustee for the Carmella Adams Trust. The Court will simply refer to "Adams" both in reference to the individual and the Trust.

MEMORANDUM OF DECISION - 4

of NGI stock, a number equal to the number of shares owned by Brian. Ex. 115 (Stock Purchase Agreement). Adams paid $181,250.00 of that amount before executing the Stock Purchase Agreement: $100,000.00 on May 22, 2006, $56,250.00 on July 12, 2006, and $25,000.00 on July 27, 2007. Adams paid the remaining $175,000.00 when the Stock Purchase Agreement was executed.

The parties disagree about what Brian, and possibly Debtor, told Adams prior to his investment in the business.[7] Debtor testified he met Adams only briefly on a handful of occasions and left the negotiating up to Brian. Brian testified that he told Adams his investment was necessary to pay unpaid payroll and sales tax liabilities. Questioning by Adams' counsel focused on the fact that NGI did not pay its tax liabilities with Adams' first $100,000 payment, and those amounts remained on NGI's June 30, 2006 Balance Sheet. Ex. 112. Brian explained that what he meant by that statement was that a portion of Adams' overall investment would pay off the back taxes, but not necessarily the first payment. He testified he used the initial payment to pay off some of NGI's other creditors, because those liabilities were more urgent than the tax liabilities.

### D. Unexplained transfers

On May 31, 2006, shortly after Adams made the initial payment to NGI, NGI transferred $37,750.00 to Debtor, despite NGI's outstanding tax liability and

---

[7] Although Adams did not testify, the questions posed by his counsel implied he disagreed.

MEMORANDUM OF DECISION - 5

other urgent obligations. Debtor submitted a declaration that he did not remember receiving any payments from NGI in 2006, Ex. 108 at 3, and testified he did not recall why NGI made that payment to him. Brian testified that the transfer was to repay two loans Debtor had made immediately before Adams invested in NGI. *See* Ex. 114 at 1 (listing transfers from Debtor to NGI of $20,000.00 on February 23, 2006 and of $17,750 on May 10, 2006). Brian's testimony did not provide further details about the transfer.

Adams also questioned Debtor about six other transactions listed on the Quickbooks record as occuring on May 31, 2006. Each of those items was a transfer for $20,000.00; three were from Debtor to NGI, while three were from NGI to Debtor. The Quickbooks memo entry for two of the entries said "Reclassify fund..." before being truncated, and the memo entry for another said "Correction to je..." before being truncated. Brian testified he could not explain why those entries were made, but he believed they were corrective entries given the memo entries and the fact they were in apparently offsetting amounts.

E.     **Failure to provide 2009 schedule K-1**

The parties agree Debtor failed to produce a 2009 tax schedule K-1 establishing Debtor's shareholder income from NGI, although Debtor did produce K-1 schedules for the years 2005 through 2008. In 2008, Debtor paid his own accountant to file taxes for NGI because the corporation did not have the funds to do so. Debtor testified he did not provide the 2009 schedule K-1 because "there

MEMORANDUM OF DECISION - 6

were no funds" to file them. Brian further explained that NGI did not have the money to pay an accountant to do its corporate taxes for 2009, and Brian personally could not afford to have it done either. Thus no corporate taxes returns were filed for 2009, and Debtor's schedule K-1 was not produced.

### F.   Dissolution of NGI and Debtor's Bankruptcy

NGI continued to lose money, even after Adams' investment, and Debtor continued to loan funds to the company. Over the life of the business, Debtor's loans to NGI totaled $598,965.20. Ex. 114. By early 2009, Debtor informed Brian that he could no longer afford to put additional funds into NGI, and they decided to dissolve the corporation. Brian asked the franchisor to take over, and the franchisor finished the last few jobs and paid the employees their final paychecks.

After NGI dissolved, Adams filed a lawsuit against NGI and Debtor in the Second Judicial District Court of the State of Nevada. On February 8, 2012, the Court entered a $425,511.45 judgment against Debtor. Ex. 109 at 4–5.

Debtor filed a voluntary chapter 11 petition on April 19, 2012, Case No. 12-00902-TLM. Adams filed a $429,856.86 claim against Debtor based on the state court judgment. Ex. 109. The case was converted on Adams' motion on January 4, 2013. Adams filed this adversary proceeding on April 18, 2013.

## DISCUSSION AND DISPOSITION

Section 727(a) of the Bankruptcy Code requires the court grant the debtor a

MEMORANDUM OF DECISION - 7

discharge unless, among other things,

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

§ 727(a)(3).

This discharge exception "should be strictly construed in order to serve the Bankruptcy Act's purpose of giving debtors a fresh start." *Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 761 (9th Cir. 2008) (quoting *Industrie Aeronautiche v. Kasler (Matter of Kasler),* 611 F.2d 308, 310 (9th Cir. 1979)) (internal quotation marks omitted). "[A] total bar to discharge is an extreme penalty," *Ditto v. McCurdy*, 510 F.3d 1070, 1079 (9th Cir. 2007) (quoting *Rosen v. Bezner,* 996 F.2d 1527, 1534 (3d Cir. 1993)) (internal quotation marks omitted) (alteration in original), and "reasons for denial of a discharge must be real and substantial rather than technical and conjectural," 6 Collier on Bankruptcy ¶ 727.01[4], 727-12 (16th ed., Alan N. Resnick and Henry J. Sommer, eds.)).

To establish a prima facie case under § 727(a)(3), a creditor must show (1) that the debtor failed to maintain or preserve records, and (2) that the debtor's failure "makes it impossible to ascertain the debtor's financial condition and material business transactions." *Caneva*, 550 F.3d at 761 (quoting *Lansdowne v.*

MEMORANDUM OF DECISION - 8

*Cox (In re Cox) ("Cox II")*, 41 F.3d 1294, 1296 (9th Cir. 1994)) (internal quotation marks omitted). Then the burden of proof "shifts to the debtor to justify the inadequacy or nonexistence of the records." *Id.* (quoting *Cox II*, 41 F.3d at 1296) (internal quotation marks omitted).

A. **Failure to maintain records and impossibility of ascertaining Debtor's financial condition**

The Ninth Circuit has explained that while the purpose of § 727(a)(3) "is to make discharge dependant on the debtor's true presentation of his financial affairs," *Caneva*, 550 F.3d at 761 (citing *Cox II,* 41 F.3d at 1296), it "does not require absolute completeness in making or keeping records," *id.* (quoting *Rhoades v. Wikle,* 453 F.2d 51, 53 (9th Cir. 1971)) (internal quotation marks omitted). Instead, a debtor must provide sufficient written documentation to allow his creditors to reasonably "ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Id.* (quoting *Rhoades,* 453 F.2d at 53) (internal quotation marks omitted).

A debtor must provide adequate records for the businesses he owns or controls. *See Caneva*, 550 F.3d at 762 ("Without the records . . . , [a creditor] cannot determine what assets [the debtor's] business entities held or may still hold, what assets passed through them and where they might have gone, and what their present value is, if anything. . . . Thus we hold that when a debtor owns and controls numerous business entities and engages in substantial financial

MEMORANDUM OF DECISION - 9

transactions, the complete absence of recorded information related to those entities and transactions establishes a prima facie violation.").[8]

Here, Adams established a prima facie case. Debtor failed to provide certain documents that would allow his creditors to fully verify his financial dealings with NGI, including documentation of the terms of the loans underlying the $37,750.00 payment and the 2009 schedule K-1. These records are necessary for Debtor's creditors to place the final pieces in the puzzle of Debtor's finances. However, the failure to provide these documents is a relatively minor defect compared to those in *Caneva* and *Cox*, in each of which the debtor failed to provide any documentation of business finances.[9]

---

[8] Debtor argued that, pursuant to *N. Arlington Med. Bldg., Inc. v. Sanchez Const. Co.*, 471 P.2d 240, 241 (Nev. 1970), he had no duty to disclose records regarding NGI because he was a "nominal" director. Debtor was not a nominal director: he owned more shares of NGI stock than any other shareholder, and he actively participated in the management of NGI by attending board meetings, providing advice and effectively bankrolling its operations. Further, *North Arlington* is not a case about duties of corporate directors or officers, but about piercing the corporate veil, and is inapplicable in this instance.

[9] Debtor argued that the records provided were adequate based on the opinion of K. Gene Thurston. The Court was not persuaded by Thurston's testimony. Though Thurston is a certified public accountant, his license is currently inactive. Further, he has connections to Debtor and NGI that rendered his testimony less than fully objective and, thus, unhelpful. These include his long-standing relationship with the Debtor, and the fact that he was named a director of NGI in the Articles of Incorporation, even though it appears he never fulfilled that role. And he was involved in negotiations between Debtor, Brian and Adams before NGI closed its doors.

Debtor also attempted to defend the adequacy of the records by pointing out that Brian had provided various records and reports to Adams for the duration of NGI's operations after Adams invested in NGI, and that Adams had received those records without complaint. Ultimately, Adams' failure to object to NGI's previously provided records is immaterial to this inquiry. The adequacy of the records provided in this bankruptcy must be determined by whether creditors can ascertain Debtor's financial condition from them, not by whether a creditor objected to the adequacy of those records in the past, when they were provided for other purposes.

MEMORANDUM OF DECISION - 10

### B.     Debtor's justification for lack of records

Debtor argues that even if the records he provided were inadequate, his failure to keep adequate records was justified by the circumstances surrounding his involvement with NGI.

According to the Ninth Circuit, "'[j]ustification for [a] bankrupt's failure to keep or preserve books or records will depend on . . . whether others in like circumstances would ordinarily keep them.'" *Cox II*, 41 F.3d at 1299 (quoting *Gross v. Russo (In re Russo),* 3 B.R. 28, 34 (Bankr. E.D.N.Y. 1980)) (second alteration and omission in the original).  The Circuit recognized that reliance could factor into a debtor's justification, stating:

> We believe, however, that if [the debtor] did in fact rely on [the debtor's spouse] for record keeping, such reliance *is* relevant in determining "justification" under § 727(a)(3). In any business relationship involving more than one person, the "partners" will usually delegate responsibilities, including record keeping, among themselves. Such delegation is even more likely to occur in cases like this one where the "partners" are married, and one spouse has significantly more business experience, knowledge and expertise than the other.

*Lansdowne v. Cox ("Cox I")*, 904 F.2d 1399, 1403 (9th Cir. 1990).

The Circuit remanded the case, listing six factors the bankruptcy court was to consider, along with other relevant factors:

> (1) [the debtor's] intelligence and educational background; (2) [the debtor's] experience in business matters; (3) the extent of [the debtor's] involvement in the businesses for which discharge is sought; (4) [the debtor's] reliance on [the other party] to keep records, including what, if anything, [the debtor] saw or was told that indicated [the other party] *was* keeping records; (5) the nature of the marital relationship; and (6)

MEMORANDUM OF DECISION - 11

>any recordkeeping or inquiry duties imposed upon [the debtor] by state law.

*Cox I*, 904 F.2d at 1404 n. 5.[10]

While the holding in *Cox I* specifically said reliance on a spouse should be considered when analyzing a debtor's justification, the Court's reasoning explicitly stated delegation of responsibilities could happen in any business relationship. Here, Debtor had a close familial relationship with Brian, and Debtor trusted Brian to run the business in which Debtor had invested a significant amount of money. Debtor also trusted Brian to keep or oversee the keeping of that business' books.

Debtor's reliance on Brian to maintain records for the business was reasonable. While Debtor operated turf farms and other businesses for more than thirty years, his role in NGI was supposed to be minimal. NGI was Brian's business. Brian did not have experience running a business, but had earned an MBA and had taken an accounting class and so appeared to have the requisite knowledge and skills to ensure adequate records were kept. And Debtor was managing his own turf businesses, leaving him little time to delve deeply into

---

[10] After the bankruptcy court considered those factors on remand, it again found the debtor's failure to provide information was unjustified. But on a second appeal, the Ninth Circuit overturned the bankruptcy court's ruling. The Circuit held that the bankruptcy court was wrong to say the debtor's failure to provide records was unjustified because she had never inquired about whether her husband was actually keeping records. Instead, the Circuit said that despite the debtor's relatively sophisticated business background, the lack of warning signs meant she had no independent duty to inquire into her husband's recordkeeping. *See, generally, Cox II*, 41 F.3d 1294.

MEMORANDUM OF DECISION - 12

NGI's finances.

While Debtor had significantly more involvement in the subject business than did the debtor in *Cox*, the violations of § 727(a)(3) were less egregious. In his informal review of NGI's books as an officer and director of the corporation, Debtor was presented with evidence that Brian was actually keeping the books, and so his failure to note the lack of documentation on particular transfers was reasonable. While Debtor's past business experience allowed him to understand the books and provide advice on business operations, his experience and his role at NGI were not such that Debtor could be reasonably expected to notice what was not there, among all the records that were. The Court determines Debtor's failure to provide the documents underlying the $37,750.00 transfer from NGI to Debtor is justified on the whole of this record.

Adams' counsel did not mention Debtor's failure to provide a schedule K-1 in his closing arguments, and thus appeared to abandon that contention. To the extent Adams did not intend to abandon it, the Court determines the failure of Debtor to provide a schedule K-1 for 2009 was also justified under the particular circumstances of this case. NGI had run out of funds and could not afford to pay an accountant to compile the corporation's tax documents. Debtor and Brian had neither the requisite knowledge to file the taxes themselves, nor the money to pay a tax professional. Indeed, by that point, NGI's franchisor had stepped in to finish NGI's remaining jobs and pay NGI's employees. The Court does not condone

MEMORANDUM OF DECISION - 13

NGI's failure to complete its taxes, nor does the Court condone Debtor's failure as an officer and director of NGI to ensure the corporation filed its taxes and the corporation's dissolution was properly handled and documented. But the Court recognizes that Debtor could not provide the K-1 when it did not exist.

Ultimately, Debtor was shown to have failed to keep or produce certain documents that would shed further light on his finances. But those omissions were minimal and, following discovery and evidentiary presentation at trial, justified. The proven facts and circumstances do not justify the "extreme penalty" of a denial of discharge under the Court's precedent.

## CONCLUSION

Judgment will be entered for Debtor. A proposed form of judgment shall be submitted by his counsel.

DATED: January 3, 2014

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 14